CHARLEY LOPEZ v. THE STATE.

*No. 3928.   Decided November 28.*

1. **Rape—Insanity of Prosecuting Witness.**—On a prosecution for rape, where it was shown that the prosecutrix, who was permitted to testify over objection of defendant, was, before and at the time of the commission of the offense, as well as at the time she testified on the trial, insane, *held,* that the court erred in permitting the witness to testify in the case.

2. **Same — Statute Mandatory.** —By article 730, Code of Criminal Procedure, declaring the class of persons incompetent to testify in criminal cases, it is expressly provided in subdivisions 1 and 2: (1) That insane persons who are in an insane condition of mind when they are offered as witnesses, or who were in that condition when the events happened of which they are called to testify; and (2) children or other persons who, after being examined by the court, appear not to possess sufficient intellect to relate transactions about which they are interrogated, or who do not understand the obligation of an oath, are wholly incompetent; and this statute is mandatory.

3. **Same.**—See the opinion for a discussion *in extenso* of the difference between the rule at common law and under our statute with regard to the competency of insane persons to testify.

APPEAL from the District Court of Caldwell.   Tried below before Hon. H. Teichmueller.

Appellant was convicted in the court below for rape, and his punishment was assessed at five years in the penitentiary.   The facts of the case are sufficiently stated in the opinion.

No brief for appellant on file.

*R. H. Harrison,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—Appellant was convicted of rape.

There is but one single question to be determined in order to dispose of this appeal. The conviction rests mainly as to the *corpus delicti* upon the testimony of the prosecutrix.   She was a negro woman; the defendant was a Mexican.   She was crazy, and the Mexican had lost some fingers off of his hand.

This prosecution, however, was not based upon the latter clause of article 528 of our Penal Code, which makes it rape *per se* to have carnal knowledge of a woman being so mentally diseased at the time as to have no will to oppose the carnal act, the person having carnal knowledge of her knowing her to be so mentally diseased.   Willson's Crim. Stats., sec. 905.

When the prosecutrix was called to the stand, defendant's counsel requested and was accorded permission of the court to test her competency as a witness upon her *voir dire*, the objection to her competency being that she was insane at the time the offense occurred about which she was called to testify, and that she was still insane at the time she

was proposed as a witness; that she did not possess sufficient intellect to relate transactions; and that she did not understand the nature or obligations of an oath. The court directed the examination to be had with regard to her competency, which resulted in the following questions and answers as shown by the bill of exceptions:

"Question.—What is your name? Answer.—They put Mary Simmons to me this year.

"Q.—What did they put to you last year? A.—They put Mary Kirks to me.

"Q.—What did they put to you the year before that? A.—They put me in the prison.

"Q.—Do you know what that gentleman there, the clerk, did when you and he held up your hands? A.—No, sir.

"Q.—Do you know what he said to you? A.—No, sir.

"Q.—Do you know what it is to be sworn in court? A.—It is to speak against the truth.

"Q.—If you were to swear falsely against this man and die, what would become of you? A.—I would go to heaven and sing praises for evermore.

"Q.—If you were to swear falsely against this man, what would be done with you here on earth? A.—I guess I would be prosecuted, or put under bond.

"Q.—If you were to swear falsely here in court, do you think you would be punished? A.—I don't know. I don't think I ought to be punished, because I have been punished enough already.

"Q.—Do you know what you came here for? A.—I guess I came here to read the fourth chapter of Proverbs.

"Q.—Do you know on what day Christmas comes? A.—No.

"Q.—Do you know what day of the month the Fourth of July comes on? A.—No.

"Q.—Do you know what day of the week Good Friday comes on? A.—No, sir.

"Q.—Do you know what day of the week Easter Sunday comes on? A.—No, sir.

"Q.—What year were you born? A.—In the year thirty-three.

"Q.—Where were you born? A.—In Texas.

"Q.—In what part of Texas? A.—In Texas.

"Q.—Where is that? A.—In Georgia.

"Q.—Have you a husband? A.—I used to have.

"Q.—He was a lawyer, wasn't he? A.—Yes, sir.

"Q.—And a doctor, too, wasn't he? A.—Yes.

"Q.—And wasn't he a preacher, too? A.—Yes, but that wasn't part of his constitution.

"Q.—How many children have you? A.—Seven, I believe.

"Q.—They are all the same size, are they not? A.—Yes.

"Q.—Where are they now?   A.—Some of them are in Texas and some over in the Red Sea.

"Q.—What church do you belong to?   A.—The Catholic Baptist.

"Q.—Have not you some fine farms?   A.—I did have, but dropped them all into my shipmate.

"Q.—Who is your shipmate?   A.—Mr. Caldwell.

"Q.—Where do you and your shipmate go?   A.—Down on the bay.

"Q.—Where is the bay?   A.—Over in Georgia, by the Red Sea.

"Q.—You travel a great deal, do you not?   A.—Yes.

"Q.—How long do you stay?   A.—One, two, or three days.

"Q.—Where do you go?   A.—Up to Georgia.

"Q.—Do you go to Europe, too?   A.—Yes, sir.

"Q.—Don't you go to Asia, too?   A.—Yes.

"Q.—Don't you go to Africa, too?   A.—Yes.

"Q.—How do you come back?   A.—With my shipmate, on the bay."

The defendant's counsel here informed the court that he did not care to further examine the witness on her *voir dire* as to her competency, but would introduce other testimony on that point. Whereupon the court suggested that he would like to hear the witness questioned as to the case about which she was called to testify before passing upon her competency as a witness, and directed the district attorney, representing the State, to proceed and examine her as to the facts and circumstances of the case about which she was called to testify as a witness, stating to the counsel for the defendant that he would reserve his decision as to the competency of the witness until she had been so examined by the district attorney, and until the defendant should have introduced such other witnesses as he might choose to establish her incompetency.

Thereupon the district attorney proceeded to examine the witness, the said Mary Simmons, she being the person alleged to have been raped by defendant, said examination proceeding as follows: The district attorney, pointing to the defendant, asked the witness:

"Question.—Do you know this man?   Answer.—No, sir.

"Q.—Did you ever see him before?   A.—No, sir.

"Q.—Mary, this man is here charged with raping you. Now tell us, did he ever do anything wrong to you? Didn't you have cockle-burrs in your hair and dress, and dirt on your neck?   A.—Oh, yes, sir.

"Q.—Now, Mary, go on and tell us all about it.   A.—Well, he came up to Nelson Harper's house, where I was, and was fooling with me in the house, and I went out from the house and started off from him, and he came out behind me, and went around and met me, and he came up to me and caught hold of me, and tried to get me down, but I wouldn't do it; and we fought and tussled around there until we fell. But I was as strong as he was, and fell, not right on top, but more on top than he did, but he turned me over, and got up my clothes and 'rutted' me.

I got up, and pulled up his shirt-tail and took a stick and whipped him good. I didn't want him to do what he did. I didn't consent to it. I hallooed while he was doing me that way.

"Q.—Now, Mary, who was it that did you that way? Was it this defendant here? [pointing to him.] A.—Let me see his hand. [Defendant held up his hand, and she proceeded.] Yes, he is the man. I know he is the man who 'rutted' me. I know him by his hand having some fingers off. I know his clothes, too.

"Q.—Well, what did you do then, Mary? A.—I went right straight and told Lou. Harper and Lawyer Burditt about it."

The district attorney here announced that he was through with the witness, and upon cross-examination by defendant's counsel she testified as follows:

"I wasn't glad of it. I wish he hadn't. He just caught hold of me, and we tussled around. Yes, I did give him a good whipping with a stick as soon as I got up. No, there wasn't about ten people passed while he had me down; there wasn't but about one, two, or three. As soon as I got up I went down to 'pulk;' that is, down on the bay, over in Georgia. It was a Mexican who did me that way. I know every Mexican in this country. There is about sixty million of them. The white folks are all turning to Mexicans. I have talked to a billion people about this case. I came here from the Red Sea."

We think that this examination clearly shows that the prosecutrix was insane at the time said examination was had. In addition thereto, several witnesses were introduced who were well acquainted with her, who testified that she was insane, and had been insane for several years, and such was shown to be her reputation throughout the community in which she lived. It was also shown that previous to the occurrence complained of she had been confined in a lunatic asylum as an insane person.

Dr. Clark, a medical expert, who had heard the testimony of the prosecutrix and the other witnesses who testified on the subject, declared that in his opinion the prosecutrix was insane; that her insanity was of a permanent character; that he did not believe that she had any lucid intervals; that she was not only insane now (at the time of the trial), but that she was insane at the time of the alleged rape; that she is not competent and able to understand the nature and obligation of an oath, and does not know right from wrong. Dr. Miller, another medical expert, fully sustained the testimony of Dr. Clark.

Notwithstanding this testimony as to her sanity, or rather insanity, the court overruled the objection of defendant, and permitted the prosecutrix to testify; and, as heretofore stated, it was by her testimony alone that the *corpus delicti* was proved.

In his work on Criminal Evidence, Mr. Wharton says: "Insanity, unless amounting to entire extinction of reason, is not considered

ground for absolute exclusion from the witness box. It is, however, admissible, in order to affect his credit, to prove that witness was subject to insane delusions. If insanity or other mental incompetency be set up as a ground for exclusion, the preliminary examination of the witness is the peculiar province of the court. If the witness, in the opinion of the court, is absolutely incompetent, he should be ruled out. But to justify such exclusion, mere streaks of insanity are not sufficient. A man may have many delusions, and yet be capable of narrating facts truly; and in any view, the existence of such delusions on his part at the time of trial goes to his credit, and not to his competency. Evidence of mental disturbance at the time of the event narrated can be received to affect credibility. An inquisition of lunacy may be *prima facie* evidence of incompetency, but does not exclude if upon hearing the court find that the witness understands the nature of an oath and the facts of which he speaks. When there is no inquisition, the burden is on the party disputing sanity. We have already noticed, that where it appears that a witness was absolutely deficient of the requisite perceptive powers at the time of the event to be testified to he may be excluded by the court. Instances of this kind, however, are of very rare occurrence." Whart. on Crim. Ev., 8 ed., secs. 370-373.

Mr. Greenleaf, speaking of mental deficiency with regard to an understanding of the nature and obligations of an oath, says: "It makes no difference from what cause this defect of understanding may have arisen, nor whether it be temporary and curable or permanent, whether the party be hopelessly an idiot or maniac, or only occasionally insane, as a lunatic. * * * While the deficiency of understanding exists, be the cause of what nature soever, a person is not capable to be sworn as a witness." 1 Greenl. Ev., 13 ed., sec. 365. In a note to this same section he says: "Where, in a trial for manslaughter, a lunatic was admitted as a witness, who had been confined in a lunatic asylum, and who labored under the delusion, both at the time of the transaction and of the trial, that he was possessed of 20,000 spirits, but whom the medical witness believed to be capable of giving an account of any transaction that happened before his eyes, and who appeared to understand the obligations of an oath, and to believe in future rewards and punishments, it was held that his testimony was properly received." And he further says, citing from Coleman v. The Commonwealth, 25 Grattan, 865: "If the witness can discern right from wrong, and has power to speak from memory, he is competent."

In the case before us the examination shows that the prosecutrix, though insane, had some idea that she would be punished if she swore falsely against the defendant in court. It is also evident from her testimony with regard to the matters transpiring at the time of the alleged rape, that her recital of the facts attendant upon it are given in a clear

and unambiguous manner, and with a particularity of detail most strongly impressing the mind with the probability and truth of the facts she relates. More than this, the evidence of the other witnesses to whom she related the matter immediately after it transpired as to the statements made to them by the prosecutrix, and the physical facts which they found upon the ground at the place to which she took them and pointed out as the place where the rape occurred, all go to show a strong corroboration of her testimony in its material parts.

Again, she made complaint to these parties, they being the first persons she met with after the transaction. Her personal appearance, and the torn condition of her clothes, as well as the physical indications upon the ground, together with the fact that she was personally examined by two women at the instance of Mr. Eastwood immediately after her relation of the transaction, and found by them to be in a condition showing that she had recently copulated with a man, all tend to show most conclusively and almost beyond a doubt that she had indeed been ravished, as she stated that she had; and if, under our law, she could be held a competent witness under any circumstances, we would feel warranted in concluding from the record, as it is shown to us, that the defendant's guilt was fully established by the evidence.

But under our statute declaring the persons incompetent to testify, it is expressly provided, that "insane persons who are in an insane condition of mind at the time when they are offered as witnesses, or who were in that condition when the events happened of which they are called to testify, as well as other persons who, after being examined by the court, appear not to possess sufficient intellect to relate transactions with respect to which they are interrogated, or who do not understand the obligations of an oath," are absolutely incompetent to testify. Code Crim. Proc., art. 730, subdivs. 1, 2.

Under the plain, unambiguous, and imperative language of our statute, we are compelled to hold that "insane persons who are in an insane condition of mind at the time when they are offered as witnesses, or who were in that condition when the events happened of which they are called to testify," are totally incompetent and inadmissible as witnesses. There is no exception to this statutory rule.

Such being the case, we are constrained to further hold that the court erred in permitting the prosecuting witness Mary Simmons to testify in this case, and for this error the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.